728 F.2d 907
 PRAIRIE CENTRAL RAILWAY COMPANY, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
and
Illinois Central Gulf Railroad Company and Patrick W.
Simmons, Intervening Respondents.
 Nos. 83-1396, 83-1397.
 United States Court of Appeals,
Seventh Circuit.
 Argued Nov. 8, 1983.
Decided Feb. 23, 1984.
 
 Thomas F. McFarland, Jr., Belnap, Spencer, McFarland & Emrich, Chicago, Ill., for petitioner.
 John H. Doeringer, Chicago, Ill., Gordon P. MacDougall, Washington, D.C., for intervening respondents.
 Louis Mackall, I.C.C., Washington, D.C., for respondents.
 Before PELL, POSNER and COFFEY, Circuit Judges.
 PELL, Circuit Judge.
 
 
 1
 The petitioner, Prairie Central Railroad Company (Prairie Central), petitions this court for review of decisions of the Interstate Commerce Commission (the Commission) granting the Illinois Central Gulf Railroad Company's (Illinois Central) motions to strike Prairie Central's notices of intent to purchase certain railroad lines in central Illinois. Prairie Central contends, as it did before the Commission, that the notices of intent to purchase indefeasibly vested the Commission's jurisdiction. The Commission decided otherwise. Prairie Central now requests this court to set aside the Commission decisions and to remand the cases for further consideration.
 
 I. THE FACTS
 
 2
 Congress enacted section 401 of the Staggers Rail Act of 1980 to ensure continuous rail service on so-called "feeder" lines, access lines to main rail lines. Staggers Rail Act of 1980, Pub.L. No. 96-448, 1980 U.S.Code Cong. & Ad.News (94 Stat.) 3988-89, 4111, 4156-57. The Act gave the Commission authority to "prescribe such regulations and procedures as may be necessary to carry out the provisions of this section." 49 U.S.C. Sec. 10910(k) (Supp. V 1981). Under section 401 of the Staggers Act, the Commission must require a track owner to sell a line if a financially responsible applicant files an application to purchase the line while the owner has the line listed in category 1 of its system diagram map. Category 1 designates those lines that a carrier anticipates will be the subject of an abandonment application within the following three years. 49 C.F.R. Sec. 1152.10(b)(1) (1982).
 
 
 3
 On September 18, 1981, Illinois Central filed a system diagram map with the Commission. On the system diagram map, the railroad designated the two disputed lines in category 1 for the first time. In March, 1982, pursuant to the feeder line program, Prairie Central filed notices of intent to purchase the two lines. See 49 U.S.C. Sec. 10910(b)(1)(B) (Supp. V 1981). Under the regulations then in effect, a carrier which sought to acquire a railroad line had to wait ninety days after it filed a notice of intent to purchase before it could file its application to purchase. 49 C.F.R. Sec. 1128.2(a) (1981).
 
 
 4
 On April 6, 1982, during the ninety-day waiting period, Illinois Central filed an amended system diagram map. The amended map changed the designation of the two disputed lines from category 1, lines anticipated to be the subject of abandonment within three years, to category 5, which encompasses "all other lines." 49 C.F.R. Sec. 1152.10(b)(1), (5) (1982). Thereafter, Illinois Central filed with the Commission motions to strike the notices of intent to purchase the lines. Illinois Central claimed that only an actual application to purchase, not a mere notice of intent to purchase, could engage the Commission's jurisdiction.
 
 
 5
 Prairie Central argued, in response to the motions to strike, that a notice of intent is sufficient to vest jurisdiction indefeasibly in the Commission. Otherwise, Prairie Central maintained, the removal of railroad lines from system diagram maps after the filing of a notice of intent to purchase would frustrate the feeder program altogether.
 
 
 6
 The Commission ruled in favor of Illinois Central. Citing 49 C.F.R. Sec. 1121.23 (1981), the Commission declared: "A carrier may amend its SDM at any time." The cited regulation, now found at 49 C.F.R. Sec. 1152.13(a) (1982), states: "Amendments may be filed at any time and will be subject to all carrier filing and publication requirements...." Prairie Central has never contended that Illinois Central failed to meet the filing and publication requirements. Accordingly, the Commission granted Illinois Central's motions to strike Prairie Central's notices of intent to purchase.
 
 
 7
 Prairie Central has petitioned this court for review to annul the Commission decisions which granted Illinois Central's motions to strike. Prairie Central relies upon the same argument advanced before the Commission: that the filing of a notice of intent to purchase the lines indefeasibly invoked the jurisdiction of the Commission. Consequently, according to Prairie Central, Illinois Central's subsequent amendment of its system diagram map did not preclude the finalization of the Commission's jurisdiction.
 
 II. THE CISCO CASE
 
 8
 This court recently decided the case of Cisco Cooperative Grain Co. v. Interstate Commerce Commission, 717 F.2d 401 (7th Cir.1983). In Cisco, Illinois Central had listed several railroad lines in category 1, for abandonment, on its system diagram map. After Cisco and Prairie Central filed notices of intent to purchase the lines, but before they could file an application to purchase because of the ninety-day waiting period, Illinois Central filed applications to abandon. Under its regulatory program then in effect, the Commission decided that, because Illinois Central's application to abandon preceded any application to purchase, the Commission's jurisdiction never vested. Therefore, the Commission granted the motions to strike the notices of intent to purchase. Despite the subsequent revocation, discussed below, of the regulation that required ninety days to elapse between the notice of intent to purchase and the application to purchase, the court held that the regulation was both a prerequisite to Commission jurisdiction and "a reasonable interpretation of the statute." 717 F.2d at 407.
 
 
 9
 The Cisco case made the Commission realize that the ninety-day waiting period created a mechanism whereby a railroad contemplating abandonment could avoid Commission jurisdiction by filing for abandonment within the period. Consequently, the Commission has since eliminated the waiting period provision. 48 Fed.Reg. 9,649 (1983).
 
 
 10
 Moreover, "to achieve an interpretation compatible with the Congressional intent," 128 Cong.Rec. H5821 (daily ed. Aug. 12, 1982) (remarks of Rep. Florio), Congress amended part of the feeder program statute to assure that jurisdiction vests in the Commission as soon as a carrier files a notice of intent to purchase. Thus, the Commission's jurisdiction now vests whenever a railroad line is in category 1 on a system diagram map and there is an application to purchase "or any required preliminary filing with respect to such application" filed before the owner of the lines files an application to abandon. 49 U.S.C. Sec. 10910(b)(1)(A)(ii).
 
 
 11
 If the amendment applied to the present case, then Prairie Central's notices of intent to purchase would have vested jurisdiction in the Commission, and the Commission decision would be erroneous. The amendment, however, is inapplicable to this controversy. Congress provided that the amendment to section 10910(b)(1)(A)(ii)
 
 
 12
 shall be effective with respect to any application or preliminary finding with respect to which the Commission has made no final decision before May 1, 1982, except that such amendment shall not affect any line which has been removed from the carrier's system diagram map before the date of the enactment of this Act [Jan. 14, 1983].
 
 
 13
 Rail Safety and Service Improvement of 1982, Pub.Law No. 97-468, Sec. 506(b), 96 Stat. 2543 (1983). Although Illinois Central removed the disputed lines from category 1 on its system diagram map prior to May 1, 1982, there was no final Commission decision in this case until after that date. We must decide whether the change in status from category 1 to category 5 was effective to "remove" the lines from Illinois Central's system diagram map within the meaning of the retroactivity provision of the statutory amendment.
 
 
 14
 The legislative modification of section 10910(b)(1)(A)(ii) occurred prior to this court's decision in Cisco. Although it was unnecessary to the decision in Cisco, this court stated that, "read literally, the statutory requirement of removal from the carrier's system diagram map could only occur when the carrier actually abandoned a line and ceased to operate it." 717 F.2d at 405. The court went on to state that Congress had intended to affect all final administrative decisions after May 1, 1982 under the feeder program, which is at issue here, as opposed to affecting the abandonment program at issue in Cisco. A footnote indicates, however, that the court did not decide whether "removal from the system diagram map" applies only when a carrier abandons a line or if merely changing the category accomplishes such a removal. Id. at 405-06 n. 2.
 
 III. THE DECISION
 
 15
 The regulation that allows carriers to file amendments to their system diagram maps specifically empowers them to file amendments "at any time." 49 C.F.R. Sec. 1152.13 (1982). Although we might feel that, as a matter of policy, the Commission should have forbidden amendments once an applicant filed a notice of intent, we must defer to the Commission's regulations as long as they are reasonable. Administrative Procedure Act Sec. 10, 5 U.S.C. Sec. 706 (1976). We note again that Congress and the Commission have eliminated the problem presented in this case, the former by vesting jurisdiction in the Commission as soon as an applicant files a notice of intent to purchase, and the latter by eliminating the ninety-day waiting period. Once jurisdiction vests, an owner cannot divest the Commission of jurisdiction by later filing for abandonment, Indiana Hi-Rail Corp.--Feeder Line Acquisition, 366 I.C.C. 42 (1981); nor would it be reasonable to allow a subsequent change in a line's designation to effect such a divestiture. In the context of the legislation and rules in effect at the time this case arose, however, the regulation that allowed map amendments at any time was a reasonable interpretation of the section of the feeder program that required each carrier to maintain a complete diagram of its transportation system.
 
 
 16
 The legislative history, cited at page 908, supra, reveals that the purpose of the feeder program was not to assure easy acquisition for potential railroad line purchasers; rather, the purpose was to facilitate sales once a line owner decided to abandon. Thus, nothing precluded the Commission from allowing a railroad to withdraw a line from category 1 even after a potential purchaser filed a notice of intent to purchase. The possibility of bad faith redesignations of lines to defeat jurisdiction is obvious and has since been eliminated. Yet, even under the old statutory scheme, if the owner failed to maintain adequate service on a line, then the Commission could force the owner to sell the line under the "public convenience and necessity" standard of section 10910(b)(1)(A)(i).
 
 
 17
 The holding of this court in Cisco compels us now to reaffirm that, under the old legislative scheme, the Commission's jurisdiction could not arise until the petitioner filed its application to purchase. Since Prairie Central could not file such an application until June 1982, nothing precluded Illinois Central from amending its system diagram map on April 6, 1982, in order to change the designation of the two lines in question from category 1 to category 5.
 
 
 18
 The Commission contends that this change of designation "removed" the lines from Illinois Central's system diagram map for purposes of the retroactivity provision of section 10910(b)(1)(A)(ii). See supra page 909. Despite our comments in Cisco, which may have suggested that abandonment is the exclusive means of accomplishing a "removal" from a system diagram map, we find the Commission's interpretation of the retroactivity clause to be compelling. If abandonment were the exclusive means of effecting removal, any railroad line listed in any category of a system diagram map would be susceptible to the forced sale embodied within the feeder program statute. Congress undoubtedly could not have intended the program to sweep so broadly, nor does the language of the statute compel such a result. We believe that we should interpret "removal" from a system diagram map to mean removal from those categories on the system diagram map that indicate that a carrier contemplates abandonment or is in the process of abandoning, i.e., categories 1 and 2. The lines in category 5 have nothing to do with the abandonment process. Therefore, the change in designation effected by the April 6, 1982 amendment to Illinois Central's system diagram map removed those lines from its map for purposes of the retroactivity provision.
 
 
 19
 Thus, the old provisions, which required a preapplication waiting period, control the present controversy. Furthermore, Cisco held that the waiting period regulation was a reasonable interpretation of the feeder program statute and that jurisdiction did not vest in the Commission until a carrier filed an application to purchase, not merely a notice of intent. As a result, we must conclude that the Commission acted properly in dismissing Prairie Central's notices of intent to purchase as Prairie Central could not establish the jurisdictional predicate to the exercise of Commission jurisdiction.
 
 
 20
 Consequently, the orders of the Commission are
 
 
 21
 AFFIRMED.